Ned N. TRANEL, Appellant (one of defendants below),

v.

Eloise S. GILKEY, Individually and as Executrix of the Estate of S. A. Gilkey, Deceased, Appellee (plaintiff below).

Gayle POTTER, Appellant (one of defendants below),

v.

Eloise S. GILKEY, Individually and as Executrix of the Estate of S. A. Gilkey, Deceased, Appellee (plaintiff below).

Nos. 4299, 4300.

Supreme Court of Wyoming.

July 18, 1974.

Lawrence A. Yonkee and Tom C. Toner, of Redle, Yonkee & Arney, Sheridan, for appellant Ned N. Tranel.

Wade Brorby, Gillette, for appellant Gayle Potter.

Henry A. Burgess, of Burgess & Davis, Sheridan, for appellee.

Before PARKER, C. J., and McEWAN, GUTHRIE, McINTYRE and McCLINTOCK, JJ.

Justice McINTYRE delivered the opinion of the court.

Eloise S. Gilkey, individually and as Executrix of the Estate of S. A. Gilkey, her deceased husband, initiated an action in replevin to obtain possession of certain Charolais cattle which were owned by her and in possession of Gayle Potter, defendant. After recovering possession of the cattle, the plaintiff instituted suit against Ned N. Tranel and Gayle Potter for an accounting of cattle lost by them, which cattle had been delivered to Tranel pursuant to a written agreement between Tranel and the Gilkeys. In her suit, Mrs. Gilkey asked for delivery to her of all registration papers on the cattle and for damages in the sum of $9,103.00 caused by Potter's cattle eating the 1969 grass crop on the Gilkey ranch.

Potter counterclaimed against Mrs. Gilkey for $63,260.00, as damages sustained by him in caring for the Gilkey cattle and for breach of contract. He alleged that he and the Gilkeys had entered into an oral contract concerning the possession and care of the Gilkey cattle.

Potter also cross-claimed against defendant Tranel for breach of contract. Tranel had entered into an agreement with Potter for a livestock operation, whereby he sublet Gilkey lands to Potter, without the knowledge or approval of the Gilkeys. It was warranted to Potter that Tranel had a right to enter into such agreement, and Tranel agreed to hold Potter harmless from any and all liability which might arise as a result of Tranel losing his rights in the Gilkey lands. Potter sought damages against Tranel for $40,000.00 for breach of contract.

Facts in the case and the basis for the trial court's conclusions are set forth quite fully in a statement of Findings of Fact and Conclusions of Law by the trial court. We think the case will be best understood by setting out the trial court's Findings of Fact and Conclusions of Law. They are as follows:

## "FINDINGS OF FACT"

### "1.

On September 30, 1968, S. A. Gilkey and Eloise S. Gilkey and Defendant Tranel entered into a Livestock Agreement which was received in evidence as Plaintiff's Exhibit 1.

### "2.

That S. A. Gilkey died February 2, 1970 and Plaintiff is the duly appointed, qualified, and acting Executrix of the estate of S. A. Gilkey and is also the surviving wife of S. A. Gilkey. That Defendant Potter did file a Creditor's Claim in the administration of such estate for services rendered in caring for the Gilkey cattle.

### "3.

That pursuant to said Livestock Agreement, Plaintiff and her husband delivered to Ned N. Tranel the following number and classes of registered Charolais cattle, then owned by both the Plaintiff and her husband, S. A. Gilkey, to-wit:

6 registered herd bulls
137 registered cows
3 non-registered cows
35 registered heifers
53 heifer calves, of which 30 could be registered
55 steer calves
1 yearling steer

being a total of 289 head of Charolais cattle.

"4.

That Defendant Tranel negligently failed to properly care for and feed these cattle during the winter of 1968–1969, and in March 1969 he abandoned said Livestock Agreement and the cattle without the knowledge or consent of Plaintiff or her husband, and delivered the Gilkey cattle to the Defendant, Gayle Potter.

"5.

That 111 of the above mentioned cattle died of neglect and starvation during the winter of 1968 and 1969, these cattle being of the following classes: 61 cows, 48 calves and 2 herd bulls.

"6.

That the market value of the cattle lost was: the average market value of the 61 cows was $351.85 each which totals $21,462.85; the average market value of the 48 calves was $200 each which totals $9,600; and the bulls were of a market value of $500 and $800 respectively, which totals $1,300. That the total loss sustained by the Plaintiff from the loss of these particular cattle was $32,362.85.

"7.

That during the spring of 1969 an additional 20 cows, 3 calves, and 1 steer owned by the Gilkeys were lost in a spring storm while in the possession of Defendant, Gayle Potter, but the loss of these cattle occurred in a blizzard on or about April 30, 1969 and was not the result of Potter's negligence.

"8.

That on March 19, 1969, the Defendant Tranel and the Defendant Potter entered into a Lease Agreement whereby Potter was allowed to graze his cattle on the Plaintiff's ranch. That the Plaintiff was not a party to this Agreement and did not agree to its terms. In said Agreement, Defendant Tranel warranted to Defendant Potter that he had the legal right to lease said lands of the Gilkeys to Potter and agreed to hold Potter harmless from any liability which might result from any claim of the Gilkeys.

"9.

That the Defendant Potter grazed cattle on the Gilkey ranch in 1969 and did not pay for the use of such pasture. The reasonable value of Plaintiff's grass crop used by Potter in 1969 was $9,103.

"10.

That Defendant Potter refused to return Plaintiff's cattle on demand. That after the filing of the original Complaint in this action, Defendant Potter delivered the following Charolais cattle to the Plaintiff on the dates and in the numbers indicated, to-wit: November 19, 1970—19 cows and 14 calves; November 22, 1970—83 cows, 2 heifers, and 48 calves; November 24, 1970—12 heifers, 6 yearling bulls, and 3 herd bulls; for a total of 187 head of cattle.

"11.

That Defendant Potter has refused to produce and deliver the registration papers on the Gilkey cattle upon Plaintiff's demand.

"12.

That no firm agreement or contract, either written or oral, was ever reached between the Plaintiffs and Defendant Potter concerning Potter's possession of the Gilkey cattle.

"13.

That the reasonable value of caring for the Gilkey cattle by Potter was the sum of $11,630."

"CONCLUSIONS OF LAW"

"1.

That the Defendant Tranel had a duty to care for the Gilkey's cattle which had

been delivered to him in good husbandlike manner and he failed to do so. As a result of his neglect, 61 Charolais cows, 48 Charolais calves and 2 bulls with a value of $32,362.85 died and Plaintiff Eloise S. Gilkey should have Judgment and recover such amount from the Defendant Ned Tranel.

"2.

That Defendant Potter took possession of the Gilkey cattle on or about April 1, 1969 and cared for them until November 1, 1970 and while he and the Plaintiff never entered into an Agreement as to the amount of compensation for the running of her cattle, the Defendant Potter is entitled to be paid a reasonable sum therefor which is the amount of $11,630.

"3.

That in the summer of 1969, Defendant Potter grazed the Gilkey Powder River ranch lands under an Agreement between Tranel and Potter and the Plaintiff Gilkey is entitled to be paid the reasonable value therefor which is the sum of $9,103, which amount Plaintiff may recover from the Defendant Potter for his care of the Gilkey cattle. That in the event Defendant Tranel is liable unto the Defendant Potter for the sum of $9,103 for the breach of warranty made by Tranel that he had the right to lease said grass unto the Defendant Potter." [1]

Based upon the Court's Findings of Fact and Conclusions of Law, judgment was entered reciting the following:

"IT IS, THEREFORE, HEREBY ORDERED, ADJUDGED AND DECREED by the Court that the Plaintiff have and recover Judgment on her Amended Complaint against the Defendant, Ned N. Tranel, for the sum of $32,362.85 for the loss of her cattle, and against the Defendant, Ned N. Tranel and Gayle Potter, jointly and severally, for the sum of $9,103.00 for the pasturage of her grass in 1969.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the Defendant have and recover Judgment on his Counterclaim against the Plaintiff, Eloise S. Gilkey, the sum of $2,527.00, being the difference between the amount due and owing on said Counterclaim for the care of the Plaintiff's cattle, and the amount ordered to be paid unto the Plaintiff for the use of her pasturage.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that Defendant Gayle Potter on his Cross-Claim with the Defendant, Ned N. Tranel have and recover Judgment against said Defendant, Ned N. Tranel, the sum of $9,103.00.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that all Counterclaims and Cross Claims of the Defendants be dismissed except for the relief herein granted.

"IT IS, FURTHER ORDERED, ADJUDGED AND DECREED by the Court that all costs accrued herein be paid by the Defendant, Ned Tranel."

There seems to be uncontradicted testimony that 34 cows (rather than 61) died from starvation and neglect in the winter of 1968–1969, while 62 calves (rather than 48) died from neglect and other causes. This means Tranel should be charged with the loss of 34 cows at the price of $351.85 each, instead of 61 cows at that price. It also means Tranel should be charged with the loss of 62 calves at $200.-00 each, instead of 48 calves at that price.

Accordingly, the judgment in favor of Mrs. Gilkey and against Tranel, for the loss of cows and calves, should be reconsidered. With respect to an allowance for Potter's care of the Gilkey cattle, there was no express contract. Parties agree, however, that Potter should be given credit for the reasonable value of his services in rendering such care. The trial court, in Finding 13, held the reasonable value of

1. Conclusion 3 appears to be ambiguous and unclear. On remand it should be made clear.

caring for the Gilkey cattle by Potter was the sum of $11,630.

█ There simply was no testimony or evidence in the case which would justify a finding by the trial court that $11,630 was the reasonable value of Potter's services. Uncontradicted evidence indicates more should be allowed and we remand the case to the district court with instructions to determine, with or without the receipt of additional evidence, what the reasonable value of Potter's services was, in caring for the Gilkey cattle. This will necessarily include a determination of when Tranel's responsibility ended; and when Potter's responsibility began and when it ended.

When the district court makes its determination with respect to the reasonable value of Potter's services, it should also make a determination with respect to off-setting considerations, including these:

1. It is suggested that Potter actually cared for the Gilkey cattle during a period of four months more than he has been given credit for; that he should be given credit for this period; and that it should be charged to Tranel.

2. Complaint is made because Potter did not register or deliver registration papers to Mrs. Gilkey. She was therefore compelled to sell cows and calves as commercial animals and not as registered Charolais animals. See Finding 11 of the trial court's Findings of Fact. The question is whether Mrs. Gilkey is entitled to off-setting damages on account of a failure to deliver registration papers; and if so, how much?

3. The most Potter could claim was a right to graze 125 animal units. There is evidence and a claim that he grazed more. It should be determined whether that is true; and if so, what compensation on account thereof should be allowed to Mrs. Gilkey and against Potter, for the extra animal units grazed.

4. Paragraph 12 of the Livestock Agreement between Gilkey and Tranel provides:

"All losses of female breeding stock belonging to Gilkey during 12 months preceeding branding time, except as below, shall be satisfied by replacement of a recordable female calf of equal or better quality and Charolais percentage from Tranel acceptable to and to be branded with the brand of Gilkey at branding time. Large losses attributed to unavoidable disaster not caused by negligence to be shared on 50–50 basis."

Tranel interprets this paragraph to mean the damages for loss of Gilkey cows can be settled by payment of the market value of a calf for each cow lost. There is, however, no evidence that Tranel or Potter ever replaced or attempted to replace female breeding stock, which had been lost, with *recordable* female calves of equal or better quality and Charolais percentage. The question therefore arises as to whether damages for loss of Gilkey cows can be settled by payment of the market value of a calf for each cow lost, as claimed by tranel. We have frequently said we prefer not to decide questions of this kind until they have first been decided by the trial court.

This means the trial court should determine whether Tranel's interpretation of paragraph 12 is correct; and whether Tranel or Potter did what was necessary to take advantage of it. If the interpretation is not correct, then damages for the loss of Gilkey cows cannot be settled by payment of the market value of a calf for each cow lost. If Tranel's interpretation is found to be correct, then the trial court must determine what credit needs to be given to Tranel or Potter on account of paragraph 12.

We have heretofore made it clear that the judgment in favor of Mrs. Gilkey and against Tranel, for the loss of cows and calves, should be reconsidered. We have also made it clear that, when the district court determines the reasonable value of Potter's services, it should also make a determination with respect to certain off-setting considerations. Thus, the case must

be remanded to the district court for retrial.

Remanded for further proceedings.

McCLINTOCK, Justice (concurring in part and dissenting in part).

While I believe that the case must be remanded for further proceedings there are certain aspects of the majority opinion with which I cannot agree. The majority direct that there shall be a retrial of the case, which may be the best procedure, but I would much prefer that we had more carefully delineated the areas requiring further trial and those which might merely require reconsideration by the trial judge. I am also concerned that our disposition of the legal issues involved in the case may not be sufficiently definitive to be helpful.

It may put my views in better perspective if I briefly supplement the statement contained in the majority opinion. The Gilkeys owned lands on Little Powder River in Montana, some 50 miles from lands in Campbell County held under lease by Tranel. The parties entered into a written agreement whereby the Tranel lands would be used as the location for a breeding herd of Charolais cattle, the Gilkeys to put some 125 head of breeding cows on that ranch, along with a similar number of Tranel cows, and commercial cattle, mostly steers, belonging to Tranel would then be placed on the Gilkey lands to run jointly with Gilkey cattle, likewise commercial grade. Tranel was to have the responsibility for operations on his lands and Gilkey would have the responsibility for operations on his lands. The breeding phase of operation is all that we are concerned with except as Tranel may have had the right to run cattle upon the Gilkey lands, to the extent of 125 "animal units".

Because of the presumably more onerous chores connected with the breeding herd, Tranel was to receive 40% of the increase of Gilkey's cattle (the herds would be run on Tranel lands but the separate identities thereof would be preserved) except that nonrecordable offspring would be shared on a 50–50 basis. All increase of the Tranel herd would remain his.

We are concerned with losses incurred during what was unquestionably a hard winter in Campbell County. Some time in January it became apparent that the Tranel-Gilkey cattle located on the Tranel lands were not wintering well and that drastic measures had to be taken. Tranel attempted to do this with the assistance of the defendant, Potter, and it appears that had it not been for the latter's assistance both the Tranel and Gilkey herds would have been reduced even more than they were. We are not informed as to the losses to Tranel but it is clear from the record that the losses to the Gilkey herd were substantial, the principal dispute in the case being as to the actual extent thereof. Tranel does not seriously question his responsibility in the premises and as to the loss raises only the question as to the number of cows lost and the measure of damages for such losses.

With respect to the number of cows lost during the winter of 1968–69 and before the April storm, while I cannot say that the evidence is uncontradicted that 34 cows were lost, I can satisfy myself that this figure is reasonably close by working backwards from the admitted figure of 102 cows delivered by Mr. Potter to Mrs. Gilkey in November of 1970. Potter's testimony is definite that there were no cows lost after the storm in April of 1969 except one cow which died of anaplasmosis. No one denies that 20 cows were lost in the April storm although counsel for Mrs. Gilkey does question that the loss was excused because solely attributable to the storm. This establishes the figure of 123 as the number of cows received by Potter from Tranel. It is not disputed that 17 cows were sold in the fall of 1968 (although counsel for Mrs. Gilkey overlooks this fact in his brief) and that two were sold in the spring. This makes a total of 152 cows accounted for, or a shortage of 32 from the 174 delivered to Tranel.

As I view the case, the trial judge was led into error by accepting as dispositive of

the issue a letter of the Gilkeys written to Tranel on January 23, 1970. This letter purports to list the year of birth, number of cattle lost, percentage of Charolais blood, and value of the particular classification, and tabulates a final loss of 81 cows with a total valuation for all cows lost of $28,500.00. It is obvious that the trial judge has divided that total valuation by 81 to arrive at an average valuation of $351.85 a cow. He did this to make allowance for the 20 cows lost in the storm, the ages and Charolais percentage of which particular cows could not be separately determined. He then uses that average figure to arrive at the value of the 61 cows found by him to have been lost as the result of Tranel's acts, or $21,462.85.

The letter was admitted over the objection of Tranel's counsel that it was an offer of settlement and I think that objection should have been sustained. In my opinion it was also objectionable in that no proper foundation had been laid. Mrs. Gilkey was not personally familiar with the number of cattle lost; neither she nor her husband had attended any roundups or brandings and she seems to have been relying on certain personal notes, the nature of which was never clearly established.

I therefore agree with the majority that the loss for cows and calves should be reconsidered by the trial court. I also agree that the number of calves lost should have been found to be 62, instead of 48 as found by the trial court, and note that counsel for Tranel and the Gilkeys are in agreement on that point.

However, I cannot agree with the majority's refusal to construe the terms of the contract, particularly paragraph 12, relating to the duty of Tranel to replace Gilkey breeding stock "by replacement of a recordable female calf of equal or better quality and Charolais percentage". It is said that the question should first be decided by the district court. The issue was

raised in Tranel's answer and was one of the issues decided adversely by the trial judge when he found that Mrs. Gilkey was entitled to recover $351.85, the average value of a breeding cow, for each such cow lost. Tranel has argued the point in this court that paragraph 12 of the agreement must be applied and I do not see how we can properly require the district court again to decide this legal issue before we render our opinion as to its legal effect.

To me, the language of the paragraph is clear, and Tranel was thereby required as to any loss of breeding stock, other than large loss attributed to unavoidable disaster not caused by his negligence, to replace such loss with a recordable female calf. Admittedly he did not do this, and also admittedly a considerable time has gone by since the spring of 1969 when this replacement should have been made, but in my opinion that does not change the measure of damages which I agree with counsel for Tranel to be the then value of a recordable female calf. However, I do not agree with his further argument that such value is $200.00. While the trial judge found that the *average* value of a calf was $200.00, and applied that figure in computing the damages for calf loss, this is not found to be the value of a recordable female calf. Mrs. Gilkey was permitted to express her opinion without objection that in 1969 the market value for a yearling Charolais heifer was $250.00. The trial judge, relying upon the improper exhibit which fixed a value upon ordinary calves of $200.00, does not appear to have had before him evidence as to what would have been the value at branding time in 1969 of a recordable female calf of equal or better quality and Charolais percentage. I think that the trial court should take evidence as to this value and apply this measure of damages for Tranel's failure to make the substitution.[1]

---

1. No one appears to question the legal proposition that the measure of damages for failure to redeliver the animals is the market value at the time of such failure. See Woodburn v. Erickson (10 Cir. 1956), 230 F.2d 240, but in this case the parties have by their

However, in this aspect of the case I also note that the majority opinion fails to give Tranel any credit for 40% of the 1969 calf crop. Whatever sins of omission Tranel may have committed, the Gilkeys were specifically relying upon the contract, and by letter of July 18, 1969 they advised that the contract would be terminated as of August 1, 1969. Conceding that they had the power and right to do this, they were still bound by the terms of the contract during the time it was in effect, and I think their damages are to be measured by the provisions thereof. This point was raised in Tranel's answer, although he claimed 50% or 18 calves out of a crop of 36, and he surely was entitled to some credit. The trial court has given him no credit for those animals which he did not receive. While there was argument about the number of calves, Mrs. Gilkey claiming 36 and Potter claiming 30, I think the trial court should make a determination of this question and give Tranel proper credit therefor, the split to be evenly made between the sexes.

Concerning the allowance of $11,630.00 which the trial court made to Potter for services in pasturing and caring for the Gilkey cattle from April, 1969, to November, 1970, I agree with the majority to the extent that if there is evidence justifying the figure allowed by the trial court, I have not been able to find it and it seems quite obvious to me that he has taken the figure claimed by Potter for such services and divided it in half. Perhaps he has left out of his findings certain matters that influenced him to make this cut. If so, I think he should make his position clearer. I also think that the Gilkeys would not be liable to Potter for such services until they were aware that he was taking care of their cattle. The fact that during the period from May, 1969 to November, 1970 the parties were trying to work out a formal arrangement should not detract from the Gilkeys' liability to pay the reasonable value of the

services. Nor should the fact that the Gilkeys continued to rely upon the Gilkey-Tranel contract until August 1, 1969 affect their obligation to Potter. They knew that someone other than Tranel was looking after those cattle and expected to be compensated therefor. The fact that they did not terminate the Gilkey-Tranel contract until August 1 should mean only that they are entitled to recover from Tranel whatever amount they had to pay someone to do the work that he had undertaken to do. Here again I attempt to give full effect to the Gilkey-Tranel contract for such period as it was in effect. However, as between the Gilkeys and Tranel I do not think that the latter could avoid the obligations of the contract, including the obligation to furnish pasture and care to the Gilkey cattle entrusted to him, by passing them on to someone else. Unless and until the contract was terminated for cause the Gilkeys were entitled to look to Tranel for performance. I would therefore suggest that the trial court should allow Potter, as against the Gilkeys, the full reasonable value of his services during such period as they knew he was looking after their cattle, and permit them to recover from Tranel for such services during that period of time that the Gilkey-Tranel contract remained in effect.

In the determination of the reasonable value of the Potter services the trial court should consider the deficiencies in those services, if any. It has already found, and with complete justification in the record, that Potter failed to deliver registration papers on the cows and calves. This is mentioned by the majority with the additional statement that Mrs. Gilkey was therefore compelled to sell cows and calves as commercial animals and not as registered Charolais animals. This may also be the fact but the trial court has not so found and I could not find it in the record. Her counsel did argue that she was required to take commercial prices for the

contract made special provision as to what should be redelivered. Since Mrs. Gilkey did not get what she contracted for, it seems

elemental to me that she is entitled to the market value, at that time, of what she did not get.

1969 and 1970 calf crops and the 1971 crop could not be registered. If this is the case, and if there were injuries to Mrs. Gilkey by reason of Potter's branding in the absence of Mrs. Gilkey's representative, the number of "slick" calves and animals unaccounted for, resulting in losses to the Gilkeys, I think they are entitled to compensation but I cannot agree with counsel that the record shows that Potter was sufficiently compensated for his services in the absence of specific evidence showing his defective performance and resulting monetary loss to the Gilkeys.

The trial court found that Potter grazed cattle on the Gilkey ranch in 1969 and the reasonable value of this use was $9,103, which amount the trial court held was due from Potter to Gilkey. By a previous finding it was determined that Tranel in his agreement with Potter warranted that he had the legal right to lease the lands and agreed to hold Potter harmless for any liability which might result from any claim of the Gilkeys. The conclusion of law in respect to this warranty is unclear but judgment was entered in favor of Gilkey against Potter and Potter against Tranel in the amount of $9,103.

I am unable to say precisely just what disposition the majority make of this finding and the resulting judgment against Potter in favor of Mrs. Gilkey for $9,103. It is suggested in the majority opinion that one of the points to be considered by the trial court upon the remand should be the extent to which Potter grazed more than 125 animal units on the Gilkey lands and the amount of *extra* compensation payable to her on that account. Since the allowance of $9,103 against Potter can be mathematically shown to represent the full value of the animal units of grazing used by Potter, there could be no *extra* compensation due the Gilkeys unless this court accepts the proposition that under the basic contract between the Gilkeys and Tranel the latter was entitled to 125 animal units of grazing or 1,500 a. u. m.'s. I therefore construe the opinion as holding that Potter was entitled, through Tranel, to 1,500 a. u.

m.'s of grazing upon the Gilkey lands. At the rate of $4.50 per a. u. m. as testified without objection by Mrs. Gilkey, this would be $6,750 and the excess due the Gilkeys would be $2,358.00.

Potter began helping Tranel in January of 1969, and on March 19 entered into a contract whereby he leased from Tranel not only the lands held by Tranel under the Batinovich lease but also whatever interest he had in the Gilkey lands, that is, as provided in the Gilkey-Tranel contract, that "approximately 125 animal units for each party will be maintained on each ranch". The term "animal units" is undoubtedly a trade term, and Potter had a somewhat different understanding of that term as well as the term "animal unit months" (a. u. m.'s), but Tranel and Mrs. Gilkey both testified as to their understanding. Tranel testified that he understood it to mean that he would run the equivalent of 125 animal units on the Gilkey land. Prior to placing the yearlings upon the Gilkey lands and probably in May, Potter had a conversation with the Gilkeys concerning his rights under the Tranel agreement which Tranel had said was for 125 animals per year, and according to Mrs. Gilkey,

"We told him we would go along with that this year, 1969, and he could put the one hundred twenty-five animals down for a year, and if he put them in for six months then it would be two fifty, and on down, but not to exceed what one hundred and twenty-five animals would eat of grass."

In my opinion, then, there was no basis upon which the Gilkeys, having acquiesced in the arrangement between Tranel and Potter, and having received a material benefit therefrom, could subsequently revoke the Gilkey-Tranel agreement as to Tranel's grazing rights.

However, the Gilkeys were bound to permit grazing by Tranel or Potter only to the extent of 125 animal units. Mrs. Gilkey was not as versed in this terminology as Potter, and it is clear from her testimony that she was thinking of 125 animals,

whether cows, two year olds or yearlings, as being permitted to graze for one year, double that for six months, and so on. Expressed in a. u. m.'s, I think this meant 1,500 a. u. m's. Potter, by using Soil Conservation definitions not familiar to Mrs. Gilkey, used a factor of .8 in arriving at his total a. u. m's of 1,551 but I think that the understanding of the Gilkeys and Tranel was that each animal would be treated as one unit. Therefore, since it is admitted that Potter had 333 animals on the Gilkey land for 4⅔ months, and 141 additional animals for 3⅓ months, it follows that he used 2,024 a. u. m.'s. To the extent that these exceeded 1,500, the amount to which Tranel was entitled, it would appear that he should be liable at the $4.50 figure found by the trial court as the reasonable value. This amounts to $2,358 instead of the $9,301 allowed by the trial court. Since this is excess use over that contemplated by the Tranel-Potter agreement, there should be no recovery by Potter of this amount from Tranel.

In summary of my position, then, I think that this Court should remand the case to the district court without attempting to determine factual issues but establishing the following legal principles to guide that court in its future disposition of the case, taking further evidence on any question where it appears necessary:

1. Tranel is responsible to Gilkey for all cows, calves, and bulls lost during the winter of 1968–69, except for those which the trial court has found and may again find were lost as the result of the April blizzard. The damages for such loss of cows are the market value of such number of recordable female calves as are necessary to replace the lost cows at branding time in 1969. There has been no objection to the valuation previously found for the lost calves and bulls.

2. The Gilkeys are liable to Potter for the reasonable value of the services performed by Potter in furnishing pasture and care for such period of time between the spring of 1969 and November, 1970, as the Gilkeys were aware that Tranel no longer assumed that responsibility and that the cattle were being cared for by Potter.

3. All questions concerning the defects in service by Potter shown to have resulted in loss to the Gilkeys, and specifically including the failure and refusal of Potter to deliver registration papers on the Gilkey cows and offspring, should be determined by the trial court as a part of fixing the allowance to Potter.

4. The Gilkeys are entitled to recover from Tranel any part of their liability to Potter which represents that period of time prior to the termination of the Gilkey-Tranel contract on August 1, 1969.

5. Potter is personally liable to the Gilkeys for any excess of animal units which he placed on the Gilkey lands on the basis of 125 animal units representing 1,500 animal unit months, and without weighting the a. u. m's by inclusion of a percentage factor.